IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARTIN INGRAHAM,                    )
                                    )
                    Plaintiff,      )
                                    )
                                    )    Civil Action No. 06-111
        v.                          )
                                    )
                                    )
GEICO INSURANCE COMPANY,            )
                                    )
                    Defendant.      )


## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.


Pending before this court are cross-motions for summary judgment filed by defendant

GEICO Insurance Company ("GEICO" or "defendant") (Docket No. 67) and plaintiff Martin

Ingraham ("Ingraham" or "plaintiff") (Docket No. 64). Plaintiff filed this civil action in the

Allegheny County Court of Common Pleas asserting state law claims for breach of contract,

violation of the Pennsylvania Motor Vehicle Financial Responsibility Law, as amended, 75 PA.

CONS. STAT. §§ 1701, et seq. ("MVFRL"), and bad faith handling and denial of insurance

benefits pursuant to 42 PA. CONS. STAT. § 8371. The claims involve three motor vehicle

accidents in which plaintiff was involved as a GEICO insured on November 14, 2001, January 3,

2002, and March 11, 2003. On January 27, 2006, defendant filed a notice of removal of the

action to this court. (Docket No. 1).

After reviewing the record, considering the motions and submissions of the parties, the

court concludes that no reasonable finder of fact could render a verdict for plaintiff on his

claims. With respect to the claims asserted by plaintiff pursued under a theory of bad faith, the court concludes that plaintiff failed to provide clear and convincing evidence in support of his claims. With respect to plaintiff's claims for violation of the Pennsylvania MVFRL and for breach of contract, the court concludes that the undisputed facts and inferences therefrom drawn in favor of plaintiff do not support plaintiff's claims. Accordingly, the court will grant summary judgment in favor of defendant.

### Factual Background

The parties agree that on July 31, 2001, plaintiff purchased a Pennsylvania Family Automobile Policy (the "Policy") from defendant. The Policy provided first party benefits and uninsured and underinsured motorist coverages. (Appendix to Defendant's motion for summary judgment ("Def.'s App.") Ex. C).

On November 15, 2001, plaintiff reported to GEICO that he was in a motor vehicle accident on November 14, 2001. (Joint Concise Statement of Material Facts for Def.'s motion for Summary Judgment ("Def.'s J.S.") ¶ 16). The other party involved in the accident was an uninsured motorist. (Joint Concise Statement of Material Facts for Pl.'s motion for summary judgment ("Pl.'s J.S.") ¶ 1). Exhibits A and B to defendant's request for admissions 1) list and identify the date each medical bill which plaintiff alleges was related to the November 14, 2001 accident was submitted to defendant, and 2) list the service provided, the date of service, the amount of the bill, and, if paid, the date of the amount paid. (Def.'s App. Ex. D.) Defendant paid medical bills allegedly related to the November 14, 2001 accident, under plaintiff's personal

injury protection ("PIP") coverage, as listed on Exhibit A.  (Def.'s J.S. ¶ 18.)  Defendant sought proofs of claim, such as treatment notes, for the medical expenses listed on Exhibit B.  (Id.) Neither plaintiff nor his medical providers provided proofs of claim for the expenses listed on Exhibit B.  (Id.)  Plaintiff admits GEICO paid all submitted medical bills for the November 14, 2001 accident.  (Id.)

On October 31, 2001, Dr. Kush, plaintiff's family physician, gave him a disability slip, restricting plaintiff from working at all from November 19, 2001 to December 17, 2001, as a consequence of a separate accident on November 8, 2000. (Id. ¶ 19.) On January 30, 2002, Dr. Kush gave plaintiff a disability slip to keep him from working more than twenty hours during the time period from November 19, 2001 to December 26, 2001, an overlapping time period, due to the November 14, 2001 accident. (Id.) On November 30, 2001, plaintiff informed defendant that he potentially would be placed on limited duty work as a result of the November 14, 2001 accident. (Id. ¶ 20.)  On the same day, an employee of defendant reviewed with plaintiff his coverage for wage loss and the documentation necessary to process a PIP claim. (Id.) On December 6, 2001, Dr. Kush's practice stated that plaintiff could return to work without any restrictions. (Id. ¶ 21.)  Plaintiff did not submit a claim for wage loss under the PIP provisions of his policy with defendant until February 6, 2002.  (Id. ¶ 22.) On February 14, 2002, defendant paid all the first party wage loss to which plaintiff claimed entitlement as a result of the November 14, 2001 accident. (Id. ¶ 23.)

On October 2, 1993 and November 8, 2000, plaintiff was involved in motor vehicle accidents. (Id. ¶ 24.) He suffered injuries to his neck, spine, low back, as well as suffering headaches, dizziness, and post-traumatic stress disorder. (Id.) In a letter to Dr. Kush, dated June 24, 2002, Dr. David Oliver-Smith, plaintiff's neurosurgeon, commented:

> His [Ingraham's] symptoms began after his first motor vehicle accident and never completely resolved in between accidents. All of the accidents involved his car being rear-ended. The first accident was October 2, 1993, followed by November 9, 2000, and November 14, 2001. His most recent accident was January 3, 2002.

(Id.) Kush said none of the injuries from the November 8, 2000 accident had resolved at the time of the November 14, 2001 accident. (Id. ¶ 25.) Ingraham was still complaining of headaches, neck and back pain, dizziness, memory problems, blurred and double vision. (Id.)

On November 14, 2001, plaintiff was rear-ended while at a traffic light. (Id. ¶ 26.) He was on his way home after receiving physical therapy from the injuries he sustained in the November 8, 2000 accident. (Id.) He claimed that he aggravated his neck and back pain in the accident. (Id.) There was no bleeding, broken bones, or any contact by his head with the car. (Id.) He drove himself to West Penn Hospital where he was treated and released the same day. (Id.) In December 2001, Dr. Senter administered plaintiff a four-day treatment with steroids which relieved his neck and back pain. (Id. ¶ 26.) Dr. Kush agreed with Dr. Oliver-Smith that a comparison of the MRI studies of the cervical spine, dated March 7, 2001, and December 10, 2001, before and after the accident of November 14, 2001, showed no change. (Id. ¶ 27.) Plaintiff reported that at the time of the January 3, 2002 accident, he had fully recovered from

the November 14, 2001 accident. (Id. ¶ 28.)  On April 2, 2002, Dr. Milton Klein performed an independent medical examination ("IME") of plaintiff and opined that plaintiff had reached maximum medical improvement ("MMI") and did not demonstrate any substantial disability or impairment due to the November 14, 2001 motor vehicle accident and was capable of performing his job duties. (Id. ¶ 29.)

On May 9, 2002, defendant offered $750.00 to settle plaintiff's uninsured motorist coverage ("UM") claim for the November 14, 2001 accident.  (Id. ¶ 30.)  The claims examiner placed the UM claim in the no/low program of GEICO for no damage or low impact claims because there was minimal damage ($350) to plaintiff's vehicle.  (Id.)  The claims examiner made this offer on the basis of his review of the medical treatment records, photographs of plaintiff's automobile and the totality of the accident circumstances.  (Id.)  On July 18, 2002, plaintiff demanded $20,000 to settle his UM claim. (Appendix to plaintiff's motion for summary judgment ("Pl.'s App.") Ex. 1 12.)  GEICO rejected the settlement offer of plaintiff.  (Id.)  The $750.00 offer for the November 14, 2001 accident was repeated to plaintiff on May 29, July 1, and July 19, 2002. (Def.'s J.S. ¶ 32.)  On July 30, 2002, defendant received a letter of representation from plaintiff's attorney concerning plaintiff's UM claim for the November 14, 2001 accident.  (Id. ¶ 33.)  On November 12, 2002, plaintiff's physician noted that plaintiff was being seen for post-traumatic syndrome and extended the time period of plaintiff's disability slip with respect to his part-time job.  (Pl.'s J.S. ¶ 26.)  On July 30, August 27, September 20, October 11, November 11, and December 16, 2002, and on January 16, February 18, and March

17, 2003, defendant, through correspondence and telephone calls, requested that plaintiff's attorney provide information concerning plaintiff's UM claim. Plaintiff's attorney did not respond to defendant's requests until March 27, 2003, when he stated that he no longer represented plaintiff. (Def.'s J.S. ¶ 33.)

By letters dated April 2, May 28, July 31, 2003, defendant repeated in writing its $750.00 offer to plaintiff to settle the UM claim for the November 14, 2001 accident. (Id. ¶ 34.) Defendant received no response to those letters from plaintiff. (Id.) Plaintiff made no attempt to communicate with defendant concerning the November 14, 2001 UM claim between March 27, 2003 and November 7, 2005. (Id. ¶ 35.) On November 7, 2005, plaintiff, through new counsel, requested arbitration of the November 14, 2001 UM claim. (Id. ¶ 36.) Upon receipt of the demand for arbitration, defendant notified plaintiff of its referral of the UM matter to outside counsel for further handling. (Id.) On November 30, 2005, GEICO notified counsel for plaintiff of its appointment of defense counsel and, on January 6, 2006, GEICO notified counsel for plaintiff of the identity of its defense arbitrator. (Id. ¶ 37.) On February 21, 2007, plaintiff and defendant submitted the 2001 UM claim to mediation, which did not result in a settlement. (Id. ¶ 38.) Plaintiff made no demand in settlement of this claim from July 19, 2002 to the date of the mediation. (Id.) On June 12, 2007, defendant settled the 2001 UM claim with plaintiff for $11,000. (Id. ¶ 39.)

On January 4, 2002, plaintiff reported to defendant a January 3, 2002 motor vehicle accident. (Id. ¶ 40.) Plaintiff was rear-ended in his car while stopped at a traffic light. (Id.) His

head and body moved backwards and forwards. (Id.) There was no bleeding, broken bones, or any contact by his head with the car. (Id.) Ingraham claimed neck and back pain, deep vein thrombosis, jaw pain, concussion, irritable bowel syndrome, and vision problems as a result of the accident. (Id.) Exhibit C of defendant's request for admissions 1) lists and identifies the date that each medical bill which plaintiff alleges was related to the January 3, 2002 accident was submitted, and 2) lists the service provider, the date of service, the amount of the bill, and the date and amount paid. Defendant paid all medical bills (with interest on some) allegedly related to the January 3, 2003 accident pursuant to plaintiff's PIP coverage, as identified on Exhibit C. (Id. ¶ 41; Def.'s App. Ex. D.)

On February 13, 2002, Dr. Lewis Khella performed a peer review organization review ("PRO") of plaintiff's treatment by Dr. Betsy Blazek-O'Neill, Ingraham's physiatrist, and determined that plaintiff had reached maximum medical improvement. (Def.'s J.S. ¶ 42.) Dr. Khella spoke with Dr. Blazek-O'Neill, who reported that he had no objective findings of any ailment with Ingraham and he was trying to direct his own treatment. (Id.) On August 2, 2007, plaintiff was examined by Dr. Larson at the request of defendant. (Pl.'s J.S. ¶ 22). Defendant received the IME report of Dr. Larson and was informed that plaintiff had not yet reached MMI and could possibly need a psychiatric evaluation. (Id. ¶ 24.) Larson opined that plaintiff was able to return to his full-time job with a twenty-five pound lifting restriction. (Pl.'s App. Ex. 1 20.) On February 14, 2003, Daniel LoPreto, Ph.D., performed a PRO of plaintiff's psychological treatment, and opined that plaintiff did not sustain a new or unique psychological

injury as a result of the January 3, 2002 accident. (Def.'s J.S. ¶ 43.) His review of the available

psychological records did not support a diagnosis of depression or post-traumatic stress disorder.

(Id.) Plaintiff, Dr. Kush and plaintiff's counsel did not request reconsideration of the PROs of

Dr. Khella and Dr. LoPreto. (Id.) On August 16, 2005, Dr. Marc Adelsheimer performed an

IME of plaintiff. (Id. ¶ 44.) Dr. Adelsheimer opined that plaintiff's symptomatology resulting

from the January 3, 2002 and March 11, 2003 motor vehicle accidents was resolved as of August

16, 2005. (Id.) Dr. Adelsheimer opined that none of the treatments that plaintiff was receiving,

including treatments from his chiropractor, neuropsychologist, podiatrist, dentist, and alternative

medical care providers, was needed as a consequence of these accidents. (Id.) Dr. Adelsheimer

opined that plaintiff could work at his full unrestricted duties. (Id.)

On August 30, 2005, defendant informed plaintiff that, based upon Dr. Adelsheimer's

IME, it would not pay any further medical expenses which plaintiff related to the January 3,

2002 and March 11, 2003 accidents. (Id. ¶ 45.) Neither plaintiff nor Dr. Kush provided any

response, dispute, or request for reconsideration concerning the IME after GEICO supplied a

copy of the report to Ingraham and Dr. Kush. (Id. ¶ 46.) Plaintiff did not submit any bills for

medical expenses which he related to the January 3, 2002 accident to defendant after August 30,

2005. (Id. ¶ 47.)

As a consequence of the January 3, 2002 accident, Ingraham completed a PIP application

on February 21, 2002, in which he stated his only employment was his full-time job as a welfare

to work coordinator with Great Lakes Research Institute. (Id. ¶ 48.) He did not make a claim

for income loss from his part-time job as a mobile therapist with KidsNet. (Id.)  Mobile therapists work directly with families to ensure they understand how to address the needs of a young person that has a mental health or mental retardation diagnosis.  (Id. ¶ 49.)  On July 12, 2001, plaintiff began work as a part-time mobile therapist for KidsNet.  (Id. ¶ 50.)  On average, plaintiff worked two hours per day, two days per week.  (Id.)  During December 2001, Dr. Lowenstein, plaintiff's supervisor, authorized Ingraham to work six to eight hours per week at $24 an hour as an independent contractor.  (Id.)  Plaintiff worked after-school hours and weekends.  Plaintiff last worked at KidsNet the week of April 7-12, 2002.  (Id.)  Ingraham left work on a medical leave of absence and never returned to work.  (Id.)  Defendant paid plaintiff wage loss benefits from April to September 1, 2002 for twenty-three weeks for 11.5 hours per week at $24 an hour based upon information received from Ingraham and KidsNet.  (Id. ¶ 51.)  Ingraham made his last claim for lost wages for the 2002 accident on August 30, 2002.  (Id.)

On August 15, 2002, Dr. Kush's practice released plaintiff to return to work full time without restriction. (Id. ¶ 52.)  Plaintiff did not contest the termination of wage loss benefits for the remainder of 2002 and all of 2003 until March 2004.  (Id. ¶ 53.)  On August 15, 2006, plaintiff settled all claims against defendant for wage loss which he related to the January 3, 2002 accident for the time period prior to August 31, 2005.  (Id. ¶ 55.)  Ingraham exhausted approximately $38,500.00 of his $50,000 policy limits for first party benefits for wage loss on the 2002 claim.  (Id. ¶ 56.)

Plaintiff did not make an underinsured motorist coverage ("UIM") claim for the January 3, 2002 accident until December 21, 2005. (Id. ¶ 57). Upon receipt of the demand for arbitration, defendant referred the January 3, 2002 UIM matter to outside counsel for further handling and notified plaintiff of the referral. (Id. ¶ 58.) The tortfeasor in the 2002 accident had policy limits of one million dollars, which must be exhausted before plaintiff has a UIM claim. (Id.) By letter dated, March 18, 2008, counsel for GEICO confirmed with counsel for plaintiff that Ingraham had no basis upon which to expect that his claim will exceed the tortfeasor's liability policy limits and that the UIM claim with GEICO could be closed. (Id. ¶ 59.)

Plaintiff reported his March 11, 2003 accident to defendant on March 12, 2003. (Id. ¶ 60.) Plaintiff's car was hit on the rear driver side quarter panel. (Id. ¶ 61.) His same car was involved in all three accidents. (Id.) There was no bleeding, broken bones, or any contact by his head with the car. (Id.) He drove himself to West Penn Hospital where he was treated and released the same day. (Id.) Plaintiff claimed that he had an umbilical hernia, neck and back pain, nerve pain, anxiety, irritability and skin blemishes as a result of this accident. (Id.) He was not diagnosed with a hernia until May 21, 2003. (Id.) Exhibit D of defendant's request for admissions 1) lists and identifies the date that each medical bill which plaintiff alleges was related to the 2003 accident was submitted, and 2) lists the service provider, the date of service, the amount of the bill, and, if paid, the date and the amount. (Id. ¶ 62; Def.'s App. Ex. D.) Defendant sought proofs of claim, such as treatment notes, for all unpaid medical expenses listed on Exhibit D, which were incurred prior to August 30, 2005, from plaintiff and his medical

providers. (Def.'s J.S. ¶ 62.) Neither plaintiff nor his medical service providers submitted any additional proofs of claim for a number of the expenses. (Id.) Defendant denied payment of all medical expenses allegedly related to the March 11, 2003 accident that accrued after August 30, 2005 based upon Dr. Adelsheimer's IME report. (Id. ¶ 64.) Defendant, however, sought additional proof of claim, such as treatment notes for certain medical expenses. (Id.)

Plaintiff did not make any claim for wage loss for the March 11, 2003 accident until July 11, 2003. (Id. ¶ 67.) When Ingraham completed a PIP application on June 17, 2003, he did not make a claim for income loss from his part-time job as a mobile therapist with KidsNet. (Id.) Following the IME on September 12, 2003, to determine whether plaintiff's wage loss was related to the 2003 accident, defendant issued payment for lost wages for plaintiff's full-time job on September 26, 2003. (Id. ¶ 68.) Plaintiff had a full work schedule of 38.75 hours per week from September 2003 to September 26, 2005 at his full-time job. (Id. ¶ 69.) On March 4, 2004, for the first time since November 2002, and for the first time pursuant to the 2003 claim, plaintiff requested wages for his part-time job as a mobile therapist for KidsNet. Upon receipt of the renewed claim, GEICO requested wage and salary verification from KidsNet. (Id. ¶ 70.) Plaintiff submitted no physician statements certifying Ingraham's inability to perform his part-time job as a consequence of the March 2003 accident. (Id. ¶ 71.) Because GEICO consolidated the handling of the 2002 and 2003 PIP claims, GEICO began paying lost wages for plaintiff's part-time job. (Id.) On June 22, 2004, GEICO issued a payment of $11,768.54 in wage benefits for Ingraham's part-time job for the time period from November 2002 to May 3, 2004. (Id.)

The claims examiner calculated the monthly amount of lost wages by adding the wages actually earned during Ingraham's nine months of employment and dividing by nine.  (Id.)

On June 23, 2004, Dr. Kush released plaintiff to return to his full-time work without restriction.  (Id. ¶ 72.)  On March 11, 2004, Ingraham received a memorandum of reprimand from his full-time employer for working additional hours and accumulating excess compensatory time.  (Id. ¶ 73.)  During the March 11, 2004 pay period, Ingraham accumulated 78.75 hours of compensatory time.  (Id.)  On February 24, 2005, Ingraham received another memorandum of reprimand from his employer for working hours outside his regular work schedule of 8:30 a.m. to 5:00 p.m.  (Id.)  Ingraham worked on evenings, weekends and holidays to complete his work schedule.  (Id.)  Ingraham took no time off for injury/illness between April 18, 2005 and August 16, 2005.  (Id. ¶ 74.)  During the week of August 7, 2005, Ingraham worked 40.75 hours.  (Id.)  During the week of August 14, 2005, Ingraham worked 42.5 hours.  (Id.)  During the week of August 21, 2005, Ingraham worked 33.75 hours.  (Id.)  During the week of August 28, 2005, Ingraham worked 36 hours.  (Id.)

On September 14, 2004, plaintiff was seen at Mercy Brain Injury Rehab by Dr. Gary Goldberg and was diagnosed with a grade two severity brain injury as a result of the January 3, 2002 accident.  (Pl.'s J.S. ¶ 37.)  As a result of the August 16, 2005 IME, Dr. Adelsheimer opined that plaintiff could continue to work full time without restrictions. (Def.'s J.S. ¶ 75.) Plaintiff did not provide GEICO with any proof of claim for lost wages due to a disability from a psychologist/psychiatrist for his part-time job as a mobile therapist at any time before August 31,

2006.  (Id. ¶ 77.)  GEICO requested that plaintiff and his mental health providers, Dr. Franzen

and Dr. Kneff, supply psychological treatment records.  (Id. ¶ 79.)  Plaintiff had signed a PIP

authorization for release of treatment records.  (Id.)  This authorization, however, was not

accepted by Allegheny General Hospital, where Drs. Franzen and Kneff met with Ingraham.

(Id.)  Plaintiff's attorneys did not supply an authorization acceptable to Allegheny General

Hospital.  (Id.)  GEICO hired a nurse case manager, Debbe Marcinko, from Rehabilitation

Planning, Inc. to obtain the records.  (Id.)  Plaintiff's attorneys did not cooperate with her in this

regard.  (Id.)  GEICO filed a writ of summons in order to commence an action in the Allegheny

Court of Common Pleas to compel plaintiff by motion to produce his medical records or sign a

medical records' release authorization for GEICO to obtain these records.  (Id.)  The court

dismissed the lawsuit for lack of jurisdiction over the PIP claim.  (Id.)

On August 30, 2005, defendant informed plaintiff by letter that, based upon Dr.

Adelsheimer's IME, it would not pay further wage loss which plaintiff alleged was related to the

2002 and 2003 accidents.  (Id. ¶ 82.)  At the time of this decision, neither plaintiff nor his

psychologists, Drs. Franzen and Kneff, had supplied GEICO with all their records.  (Id.)

Plaintiff had been seeing Dr. Franzen since 1993.  (Id.)  Plaintiff only supplied the records of Dr.

Franzen from July 4, 2003 to October 4, 2004.  (Id.)  The decision to stop paying plaintiff's

wages for his part-time job was made by Megan Gray, the adjuster, her supervisor and the claims

home office.  (Pl.'s J.S. ¶ 45.)

On May 31, June 15, and July 19, 2007, Dr. Stuart Burstein performed an independent psychiatric examination and records review of plaintiff. (Def.'s J.S. ¶ 83.) Dr. Burnstein concluded that Ingraham never was disabled from his part-time job as a mobile therapist as a consequence of a psychological or psychiatric condition. ( Id.) At the time of his deposition on December 5, 2007, Dr. Burstein reviewed additional records of Dr. Franzen and Kneff, received by GEICO (through subpoena and medical records release authorization) on August 30, 2007, and the records of the Pennsylvania Office of Vocational Rehabilitation ("OVR") received by GEICO (through subpoena) on June 18, 2007. ( Id.) His expert opinion remained the same. (Id.) Plaintiff did not provide defendant with any disability slips from physicians restricting plaintiff from working for the period after August 30, 2005, as a result of psychological or psychiatric conditions which plaintiff alleges are related to the 2001, 2002, or 2003 accidents. (Def. App. Ex. D ¶ 67.)

Ingraham was involved in another motor vehicle accident on September 26, 2005, while insured by Liberty Mutual. (Id. ¶ 85.) Ingraham filed a bad faith lawsuit in this court against Liberty Mutual, resulting from this accident, with respect to lost wages and medical expenses. (Id.) On October 27, 2005, Ingraham filed for Family and Medical Leave endorsed by Dr. Kush due to the 2005 accident. (Id. ¶ 86.) The injuries claimed from this accident are similar to the injuries claimed by Ingraham in his motor vehicle accidents of 2000, 2001, 2002, and 2003 as a GEICO insured. Dr. Kush put Ingraham on work restriction at his full-time job of twenty-five hours per week from October 3, 2005 to September 17, 2006. (Id.) On September 18, 2006, he

placed Ingraham on a thirty-hour work restriction due to the same motor vehicle accident until May 31, 2007.  (Id.)  On June 19, 2007, and November 25, 2007, plaintiff was involved in two more motor vehicle accidents while insured with Liberty Mutual.  (Id. ¶ 87.)  Defendant paid plaintiff all wage loss which plaintiff related to the March 11, 2003 accident during the time period prior to August 30, 2005, in an amount of $22,416.17.  (Id. ¶ 88.)  Plaintiff settled all claims against defendant for wage loss from the March 11, 2003 accident for the time period prior to August 31, 2005 on August 15, 2006.  (Id.)

When plaintiff reported the March 11, 2003 accident on March 12, 2003, he told the defendant that he was unsure whether he was going to make an injury claim.  (Id. ¶ 89.)  Plaintiff refused to provide a recorded statement regarding his March 11, 2003 claim on March 12 and April 3, 2003, and did not respond to telephone calls and correspondence requesting a recorded statement on March 26, April 2, April 16, April 24, April 29, May 12, May 28, and June 3, 2003.  (Id. ¶ 90.)  Plaintiff did not make a recorded statement pertaining to the March 11, 2003 accident until June 9, 2003.  (Id.)   Defendant requested that plaintiff provide authorizations for medical and employment records on October 7, 2003, November 13, 2003, April 8, 2004, and May 10, 2004.  (Id. ¶ 91.)  Plaintiff did not respond to defendant's requests for authorizations to obtain and review medical records regarding the March 11, 2003, UM claim until May 24, 2004.  (Id. ¶ 92). Plaintiff did not sign authorizations to obtain and review the records pertaining to the March 11, 2003, accident until June 18, 2004. Plaintiff admits that his attorney withheld requested documents from GEICO.  (Id. ¶ 93.)

Dr. Kush agreed with Dr. Oliver-Smith that a comparison of the MRI studies of the cervical spine, dated December 10, 2001 and July 13, 2003, before and after the accidents of 2002 and March 11, 2003, showed no change. (Id. ¶ 94.) In a September 15, 2004 letter to Dr. Kush, Dr. Benjamin Smolar, plaintiff's neurologist stated, "Mr. Ingraham presents now with mostly subjective complaints but little neurological dysfunction at this time." (Id. ¶ 95.) In a letter to Dr. Kush, dated August 4, 2005, Dr. Blazek-O'Neill, opined:

> He [Ingraham] was also demonstrating evidence of somatization disorder. I am very concerned about Mr. Ingraham's ongoing need to continue multiple forms of medical care. Despite all of this medical care, his symptoms remain virtually unchanged since the last time I had seen him in 2002. I talked to him on July 6, 2005, about taking more responsibility for his own health and wellness rather than relying upon multiple treatment.

(Id.)

On April 7, 2005, defendant referred the March 11, 2003 UM file to outside counsel for further handling and notified plaintiff of the referral. (Id. ¶ 97.) On multiple occasions, counsel for GEICO requested additional information from counsel for plaintiff concerning the UM claims and received no response. (Id. ¶ 98.) On February 21, 2007, GEICO settled the 2003 UM claim for $100,000 at mediation. (Id. ¶ 99.)

On August 15, 2006, Ingraham and GEICO agreed to settle and dismiss with prejudice all claims for wage loss prior to August 31, 2005, that resulted from the injuries that claimant sustained in the three motor vehicle accidents, including all claims for interest on wage loss prior to August 31, 2005, and all attorney's fees related to claims for wage loss occurring prior to

August 31, 2005, and to resolve and satisfy forever any claims Ingraham may now have or in the future may have against GEICO for wage loss claims prior to August 31, 2005.  (Id. ¶ 2.)  On January 26, 2007, this court entered an order that defendant's requests for admission directed to plaintiff were deemed admitted. (Docket No. 21.)  On April 27, 2007, counsel for plaintiff stipulated that Ingraham's claims for unpaid medical expenses were not part of his claim for bad faith pursuant to 42 PA. CONS. STAT. § 8371.

## Standard of Review

Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56 (c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Such concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact finder could find in that party's favor at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247- 48 (1986).  "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" Orenge v. Veneman, Civ. No. 04-297, 2006 WL 2711651, at *2 (W.D. Pa. Sept. 20, 2006) (citing Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2,8 (1st Cir. 1993; Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957), cert. denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## Analysis

Plaintiff asserts three claims against GEICO including breach of contract, violation of the MVFRL, and bad faith in the handling of plaintiff's insurance claims. Defendant moves for summary judgment on all three claims. Plaintiff moves for summary judgment only on his bad faith claims. Each claim will be addressed.

## I. Bad Faith

Plaintiff asserts claims against GEICO based upon bad faith handling and denial of insurance benefits pursuant to 42 PA. CONS. STAT. § 8371. The statutory provision provides:

### §8371. Actions on insurance policies

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith towards the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. § 8371. Pennsylvania law does not statutorily define the term "bad faith." Pennsylvania courts, however, have interpreted "bad faith" on the part of an insurer to mean "'any frivolous or unfounded refusal to pay proceeds of a policy.'" Terletsky v. Prudential Property and Casualty Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)). The Pennsylvania Superior Court has set forth two essential elements when proving a section 8371 bad faith claim:

> (1) the insurer did not have a reasonable basis for denying benefits under the applicable insurance policy; and
> (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.

Id.

The standard for a bad faith claim is "clear and convincing" evidence, which requires that the plaintiff show "that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant acted in bad faith." Bostick v. ITT Harford Group, Inc., 56 F. Supp. 2d 580, 587 (E.D.Pa. 1999). Therefore, the "insured's burden in opposing a summary judgment motion brought by the insurer is

'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial.'" The Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (quoting Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (citations omitted).

Plaintiff argues that he is entitled to summary judgment on his bad faith claim for a number of reasons. First, he argues that defendant made a low ball offer and delayed his November 14, 2001 UM claim. Second, he argues that defendant delayed settlement and evaluation of the March 11, 2003 claim. Third, he argues that defendant failed to pay timely and miscalculated wage loss benefits accrued from his January 3, 2002 and March 11, 2003 losses. Fourth, he asserts that defendant failed to pay wage loss benefits from the January 3, 2002 loss after August 31, 2005. Fifth, plaintiff argues that defendant failed to determine the full extent of plaintiff's injuries. Sixth, plaintiff argues that defendant used unqualified, under-informed, and biased physicians to deny wage loss benefits. Finally, plaintiff asserts that defendant attempted to use a wage loss release to also release plaintiff's bad faith claims. GEICO, asserts that it is entitled to summary judgment on all claims of bad faith.

### a. Settlement of November 14, 2001 UM Claim and March 11, 2003 UM Claim

On May 9, 2002, defendant made an initial offer of $750 on plaintiff's UM claim from the November 14, 2001 accident. Plaintiff claims that this offer and repeated offers of $750 were unreasonable and that they were offered in violation of the Unfair Insurance Practices Act, 40 PA. CONS. STAT. §§ 1171.1, et seq. ("UIPA"). He also claims that the amount of time

between the initial offer and the final settlement was unreasonable.  With regard to the March 11, 2003 UIM claim, plaintiff argues that no offer was made until mediation in February 2007, which was undue delay on behalf of GEICO.

Refusal to settle may constitute bad faith when the amount in question is clearly known to the insurer.  Kosierowski, 51. F.Supp.2d at 592.  Delay in settlement may also be a relevant factor in determining whether an insurer has acted in bad faith.  Id.at 588.  An extended period of time, however, between demand and settlement does not, on its own, constitute bad faith.  Id. at 589.  The primary consideration is "the degree to which a defendant insurer *knew* that it had no basis to deny the claimant: if delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred."  Id.  (citing Klinger v. State Farm Mut. Auto Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)); see Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 582-83 (E.D. Pa.), aff'd without opinion, 172 F.3d. 860 (3d Cir. 1998) (holding that even if delay of thirteen months between notification of UIM claim and settlement through arbitration was attributable to the insurer that fact, without more, would not be bad faith).

Violations of the UIPA may indicate bad faith on the part of an insurance company. See MacFarland v. United States Fidelity & Guar. Co., 818 F. Supp. 108, 110 (E.D. Pa. 1993). While the UIPA can only be enforced by the state insurance commissioner and not by way of private action, a court may look to the language of the UIPA as a guide for determining what type of conduct could constitute "bad faith" within the meaning of section 8371.  Romano v. Nationwide

Mut. Fire Ins. Co., 646 A.2d 1228, 1233 (Pa. Super. Ct. 1994).  Plaintiff relies on 40 PA. CONS. STAT. §1171.5 (a)(10)(vi) for the definition of "unfair practices," which states:

> (a) **"Unfair methods of competition"** and **"unfair or deceptive acts or practices"** in the business of insurance means:
>
> > * * *
>
> > (10) Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices.
>
> > * * *
>
> > (vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

40 PA. CONS. STAT.  § 1171.5 (a)(10)(vi).

To support his argument, plaintiff relies on two decisions that he claims are factually similar to his own:  Bonenberger v. Nationwide Mutual Insurance Company, 791 A.2d 378 (Pa. Super. Ct. 2002), and Barry v. Ohio Casualty Group, Civ. No. 04-188, 2007 WL 128878 (W.D.Pa. Jan. 12, 2007).  In Bonenberger, the Pennsylvania Superior Court heard an appeal from a judgment entered against Nationwide Mutual Insurance ("Nationwide").  Nationwide argued on appeal that Bonenberger failed to establish by clear and convincing evidence that Nationwide did not have a reasonable basis for its settlement offer and that it knew or recklessly disregarded the absence of a reasonable basis.  Bonenberger, 791 A.2d at 380.  Among other evidence of bad faith at trial, Bonenberger relied upon Nationwide having made an initial settlement offer of

$7,390.36, which was later arbitrated for $77,000 for his UIM claim. Id. at 379. The trial court found that Nationwide had no reasonable basis for its valuation and that Nationwide had failed to perform an IME on plaintiff and fully ascertain his injuries. Id. at 379-80. The trial court also found that Nationwide adopted a policy that was unethical and unprofessional and had failed to effectuate a prompt, fair, and equitable settlement which made it necessary for plaintiff to institute suit. Id. at 380. The Pennsylvania Superior Court affirmed the judgment. Id. at 379.

In Barry, the plaintiff sued Ohio Casualty Group ("Ohio Casualty") for bad faith alleging that her UIM claim was subject to low-ball tactics and delay. Barry, 2007 WL128878 at *8. An offer by Ohio Casualty for $6,000 was increased to $25,000 within a two-week period without new evidence being received. Id. Representatives from Ohio Casualty testified that the increase was not due to any particular discovery of new information, that the figures were based on estimation without documentation, and that the figures were below the low-end of a computer-generated value range used by Ohio Casualty. Id. The court determined that based upon the evidence provided a reasonable jury could conclude that Ohio Casualty acted in bad faith with respect to its offering Barry unreasonably low offers. Id.

Plaintiff did not provide evidence or argument regarding how his 2001 UM claim was valued by GEICO, but claims that the settlement offer was increased with no new information received. Defendant provided record evidence that GEICO's claim adjuster placed the 2001 UM claim in the no/low program for no damage or low impact claims because of the minimal

damage in the amount of $350.  GEICO asserts that in the assessment of the offer, defendant's claims examiner reviewed medical treatment records, photographs of plaintiff's automobile, and the totality of the accident circumstances.  GEICO also provided medical records indicating that plaintiff's neurosurgeon, Dr. Oliver-Smith, believed that plaintiff's symptoms stemmed from his first motor vehicle accident in 1993.  Plaintiff's family physician also stated that none of the injuries from plaintiff's 2000 accident had resolved by the time of the November 14, 2001 accident. Defendant provided documentation of an IME of plaintiff performed by Dr. Klein opining that plaintiff had reached MMI and did not demonstrate any substantial disability due to the November 14, 2001 accident.

The initial offer of $750 was repeated to plaintiff on May 29, July 1, and July 19, 2002. On July 19, 2002, plaintiff demanded $20,000 for settlement of the claim.  On multiple occasions through 2003, defendant attempted to obtain information concerning the valuation of plaintiff's claim, including further medical documentation, from plaintiff's attorney but received nothing. After plaintiff's first attorney ended his representation, the initial offer was repeated on three occasions.  Plaintiff argues that during this period, while he was unrepresented, the claim should have been negotiated, but asserts that no reasonable offers were made.  Plaintiff, however, admits that he made no attempt to communicate with defendant concerning his 2001 UM claim for the period between March 7, 2003 and November 7, 2005, the date on which he requested arbitration pursuant to the Policy.  Therefore, plaintiff's argument that GEICO was the

cause for the delay is without support as plaintiff provided no evidence that he responded to GEICO's letters or cooperated with its attempts to obtain more information about the valuation of plaintiff's claim.

Arbitration on the Policy took place on February 21, 2007, and the claim was finally settled for $11,000 on June 12, 2007. Plaintiff claims that the difference between the $750 and $11,000 figure, in and of itself, proves bad faith on behalf of defendant. He concludes that the only inference to be drawn from such a difference is that in the beginning GEICO was attempting to decrease the reasonable amount to which they should have paid. In neither of the decisions upon which plaintiff relies did the court rely strictly on the difference between the figures as evidence of bad faith. The courts instead relied on all the circumstances surrounding the insurance company's course of conduct. GEICO provided evidence that when making its decision on a final settlement number, it considered the entire claims file, the forum for dispute resolution, and the continued costs to defend the UM claim and bad faith lawsuit. (Interrogatories Directed to Jean Siwula of GEICO, Docket No. 74, Ex. O.) Plaintiff did not provide evidence that would convince a reasonable jury that GEICO's settlement figures were not indicative of proper valuation and that the final offer did not include all GEICO's stated considerations and not just the value of his claim. In fact, plaintiff admitted that much of the delay in settling the claim was due to his failure to cooperate with GEICO.

Plaintiff makes similar delay arguments with regard to his 2003 UM claim. Plaintiff provided evidence that no offers of settlement were made at any time after the reporting of the claim up until the mediation session in February 2007. Plaintiff claims that this fact is enough to provide clear and convincing evidence of bad faith on defendant's part. Defendant claims that it was plaintiff's lack of participation that caused the delay. Plaintiff admitted that he refused to provide a recorded statement as mandated by the Policy on two occasions and also failed to respond to telephone calls and correspondence with regard to giving the statement on eight occasions. Plaintiff also admitted that while defendant requested medical and employment records on four occasions from October 2003 to May 2004, he did not respond to those requests until May 24, 2004 and did not sign the requests until June 18, 2004. Plaintiff admitted that his attorney was withholding the documents. Plaintiff further admitted that on multiple occasions, from 2005 to 2007, GEICO's counsel requested additional information but received no response. Plaintiff did not provide sufficient evidence for a reasonable jury to conclude that GEICO did not have a reasonable basis for delaying settlement. Under those circumstances, the court concludes plaintiff failed to provide adequate evidence of undervaluing and delay to suggest bad faith for the 2001 and 2003 UM claims.

**b. Payment and Calculation of Wage Loss Benefits for January 3, 2002 and March 11, 2003 losses prior to August 31, 2005.**

Defendant argues that for all wage loss claims including those for bad faith prior to August 31, 2005, plaintiff released the claims as of August 15, 2006 and that for payments after

August 30, 2005, plaintiff failed to provide proof of claim. Plaintiff alleges that defendant's assertion that the general release included all bad faith allegations pertaining to wage loss for the period prior to August 31, 2005 is evidence of bad faith.

The general release by Ingraham was signed on August 16, 2006 and provided in relevant part as follows:

> 1. <u>Release by Martin Ingraham</u>. In consideration of the amounts to be paid hereunder, receipt of which is hereby acknowledged, Martin Ingraham, for himself, his heirs, successors, assigns, attorneys, agents and representatives, hereby forever releases and discharges GEICO ...from any and all claims, causes of action, damages, liabilities, expenses, fees or costs, which Martin Ingraham ever had, now has or may in the future claim to have had against the Releasees from any wage loss occurring prior to August 31, 2005, and all attorney's fees and costs related to claims for wage loss occurring prior to August 31, 2005, arising out of claims in contract or in tort, under statutory or common law, and including all allegations pertaining to wage loss for the period prior to August 31, 2005, express or implied, that were or could have been asserted in the Lawsuit.

(Def.'s App. Ex. A ¶ 1.)

Plaintiff claims that the release is ambiguous and must therefore be construed against the drafter. He argues that since the release does not specifically mention the bad faith claims, they were not intended to be included in the release. Plaintiff cites to parol evidence in the form of a post-execution letter sent by plaintiff's attorney to GEICO on August 28, 2006, claiming that the release was limited strictly to wage loss claims and not the allegations of bad faith pertaining to

wage loss.  For this letter to be considered, however, the relevant portion of the release would need to be ambiguous.

Under Pennsylvania law, the interpretation of a release, and the application of the parol evidence rule has been set forth as follows:

> "[W]hen construing the effect and scope of a release, the court, as it does with all other contracts, must try to give effect to the intentions of the parties. Yet, the primary source of the court's understanding of the parties' intent must be the document itself. Thus, what a party now claims to have intended is not as important as the intent that we glean from a reading of the document itself. The parties' intent at the time of the signing as embodied in the ordinary meaning of the words of the document is our primary concern."

Brown v. Cooke, 707 A.2d 231, 233 (Pa. Super. Ct. 1998) (quoting Flatley by Flatley v. Penman, 632 A.2d 1342, 1343-44 (Pa. Super. 1993) (internal citations omitted)).  "'The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.'"  Harrity v. Med. College of Pa., 653 A.2d 5, 10 (Pa. Super. Ct. 1994) (quoting Wrenfield Homeowners Ass'n, Inc. v. DeYoung, 600 A.2d 960, 963 (Pa. Super. Ct. 1991)).  In making the determination about whether a writing constitutes the entire agreement of the parties, the writing must be examined and "'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties.'"

Yocca v. The Pittsburgh Steelers Sports Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 126 A. 791, 792 (Pa. 1924)).

There are exceptions to the general rule that evidence of previous oral or written negotiations or agreements are inadmissible to explain or vary the terms of the contract. Id. at 437. Parol evidence may be introduced to vary a writing where a party avers that a term was omitted because of fraud, accident, or mistake or where a term in the contract is ambiguous. Id. The court as a matter of law must determine whether a contract is ambiguous. Hutchinson v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986). "A contract is ambiguous if it is reasonably susceptible to more than one construction and capable of being understood in more than one sense." Id. "A contract is not rendered ambiguous by the mere fact that the parties do not agree on its proper construction." Sorbee Intern. Ltd. v. Chubb Custom Ins. Co. 735 A.2d 712, 717 (Pa. Super. Ct. 1999).

Plaintiff admitted that all wage loss claims relating to the January 3, 2002 accident were timely paid with respect to all claims prior to August 30, 2005. With regard to the other claims, plaintiff asserts that the release is ambiguous because it does not specifically mention bad faith, but giving the release its most simple meaning, it is evident that any allegations pertaining to wage loss prior to August 31, 2005 were to be released. Plaintiff does not allege fraud, accident, or mistake. The pertinent section of the release provided, "and including all allegations pertaining to wage loss for the period prior to August 31, 2005, express or implied, that were or

could have been asserted in the Lawsuit." (Def.'s App. Ex. A ¶ 1.) The reasonable interpretation of that phrase would include allegations of bad faith pertaining to wage loss. Plaintiff's reference to a letter, written after plaintiff signed the release, containing his attorney's interpretation of the release is irrelevant. The release is not ambiguous and this court will only entertain wage loss allegations of bad faith for the period beginning on August 31, 2005.

   c.   **Payment of Wage Loss Benefits for January 3, 2002 Accident Losses beginning August 31, 2005.**

Plaintiff makes three allegations pertaining to GEICO's decision to discontinue benefits after August 30, 2005 for the January 2002 accident. First, plaintiff claims that Dr. Adelsheimer was not qualified to render the opinion that he did based upon plaintiff's injuries, and therefore defendant should not have relied upon it. Second, plaintiff claims that the opinion of Dr. Burstein was biased and therefore was improperly used by GEICO. Finally, plaintiff claims that GEICO failed to determine fully the extent of his injuries before stopping payment on his benefits.

In support of his argument that Dr. Adelsheimer was not qualified to render opinions on all plaintiff's ailments, plaintiff provided a copy of Dr. Adelsheimer's website dated April 4, 2008, which stated, "Dr. Adelsheimer will not see IME patients with brain and spinal cord injuries." (Pl.'s App. Ex. 7.) Plaintiff notes that Dr. Goldberg diagnosed plaintiff with a grade two severity brain injury as a result of the January 3, 2002 accident, and argues that Dr. Adelsheimer admits on his website that he is not qualified to evaluate an IME patient with a

brain injury such as plaintiff. Plaintiff argues that Dr. Adelsheimer was not provided with the records of Dr. Goldberg, OVR or the treating psychologists when he provided his opinion to defendant, and therefore, his opinion was deficient and should not have been relied upon by defendant.

With respect to Dr. Adelsheimer's qualifications, it is noted that Dr. Adelsheimer is a physiatrist, board certified by the American Board of Physical Medicine and Rehabilitation. (Def.'s App. Ex. T 11.) Although Dr. Aldelsheimer's 2008 website stated that he will not see IME patients with brain injuries, it did not suggest that he is <u>unqualified</u> to see IME patients with brain injuries, only that as of April 4, 2008 he would not see IME patients with brain injuries. There is no evidence of record to support plaintiff's argument that Dr. Adelsheimer did not have the appropriate credentials to render an opinion with respect to plaintiff's physical condition.

With respect to plaintiff's argument that an incomplete record was provided to Dr. Adelsheimer, that argument is also unavailing. Defendant maintains that it had requested all plaintiff's medical records, and Dr. Adelsheimer's opinion was based on all the information available to him at the time. Defendant also argues that they were unaware of his treatment by OVR, because plaintiff never identified OVR as one of his medical providers, and did not provide proofs of claim as to that provider. GEICO received the additional records in June 18, 2007, through subpoena almost two years after Dr. Adelsheimer's IME, at which point Dr. Adelsheimer completed an addendum to his previous report. (Def. App. Ex. T 8.) Dr.

Adelsheimer's opinion that plaintiff had recovered from his previous motor vehicle accidents did not change after he reviewed the additional records.  (<u>Id.</u>)

Plaintiff also claims Dr. Burstein only reviewed the records of Drs. Franzen and Kneff from November 19, 2003 through December 23, 2004, and was not provided with the later records.  The record reflects, however, that GEICO had not been provided with these records by plaintiff at the time of the IME.  Plaintiff further claims that the opinion of Dr. Burstein was biased and was therefore improperly utilized by GEICO. In support of his claim, plaintiff cites to Dr. Burstein's deposition testimony asserting that it suggests that Dr. Burstein had a predisposition against plaintiff.  Dr. Burstein testified:

> Q.  Of the Independent Medical Exams that you administered or performed in the last three years, have you ever come to the conclusion that someone was disabled?
>
> A.  Yes.
>
> Q.  And what percentage of the times would you say the people were disabled when that was the question presented to you versus the time like here you say he was not?
>
> A.  I think that happens in about 10 percent.
>
> Q.  Ninety percent of the time you find in favor of party that hired you, correct?
>
> MR. MORING:     Objection to form.
>
> A.  As far as the words go, they don't hire me, but they do request my service with respect to administering an examination.

> I don't always know just what the persuasion might be of a
> party that requests the exam. I oftentimes don't know what
> their thinking might be as to the level of disability or the
> presence of disability in these individuals.  I just examine
> them as best I can based on the data.

(Burstein Dep. 99-100 (December 5, 2007).)  Plaintiff suggests that since Burstein found

claimants disabled only ten percent of the time, he was biased in his examinations.  The

testimony, however, does not support this assertion.  Dr. Burstein stated, "I just examine them as

best I can based on the data." (Id. 100.)

Plaintiff argues that Dr. Burstein's report was biased because he did not have the records

of plaintiff's treating psychologists, the records of Dr. Goldberg, or the records of OVR.  Dr.

Burstein admitted that he did not have these records for his initial review when he completed his

report.  When they were presented to him at his deposition, he stated that the records would not

change his opinion about plaintiff's psychological ailments.  (Id. 83.)  He opined that plaintiff

could still perform his part-time job.  Further, plaintiff admitted that he did not provide GEICO

with any proof of claim for lost wages due to a disability from a psychologist/psychiatrist for his

part-time job as a mobile therapist at any time before August 31, 2006.  Many of the records had

to be subpoenaed and were not available to GEICO until 2007.  As it was the fault of plaintiff

that the records were not made available,  the untimely providing of the records does not support

plaintiff's contention that Dr. Burstein was biased.

Plaintiff finally asserts that defendant failed to ascertain fully his ailments before stopping his benefits and that this failure is evidence of bad faith. In support of his argument, plaintiff once again relies on Bonenberger arguing that the defendant in that case did not understand or take steps to learn of Bonenberger's condition. Bonenberger, 791 A.2d 378 at 381. Plaintiff argues that the situation is the same in his case. Plaintiff claims that GEICO failed to have him evaluated by a psychologist in a timely manner indicating bad faith on GEICO's part. Plaintiff agrees that on February 14, 2003, a PRO was performed by Dr. LoPreto, in which Dr. LoPreto concluded that there were no supporting records of plaintiff's complaints of psychological ailments and he opined that plaintiff did not sustain a new or unique psychological injury as a result of the January 3, 2002 accident. (Def.'s App. Ex. R 7-8).

Plaintiff argues that GEICO did not do enough to obtain the appropriate records to support the diagnoses and should have submitted him to a psychological IME prior to 2007. As discussed above, plaintiff admitted that he did not provide GEICO with any proof of claim for lost wages due to a disability from a psychologist/psychiatrist for his part-time job as a mobile therapist at any time before August 31, 2006. The record also reflects that GEICO requested that plaintiff and his mental health providers, Dr. Franzen and Dr. Kneff, supply further psychological treatment records and that plaintiff had signed a PIP authorization for release of treatment records. This authorization, however, was not accepted by Allegheny General

Hospital, where Drs. Franzen and Kneff met with Ingraham. Plaintiff's attorneys did not cooperate in supplying an authorization acceptable to Allegheny General Hospital.

GEICO hired a nurse case manager to obtain the records, but plaintiff's attorneys did not cooperate with her. GEICO filed a writ of summons to commence an action to compel plaintiff by motion to produce his medical records or sign a medical records release authorization for GEICO to obtain these records, but the state trial court dismissed the lawsuit for lack of jurisdiction over the PIP claim. As a result, if GEICO did not receive any evidence of disability for his part-time job from a psychological standpoint until August 2006, it is not unreasonable that it would schedule an IME in 2007. Plaintiff failed to provide clear and convincing evidence that it was unreasonable for defendant to rely on the opinion of Dr. LoPreto. Under those circumstances, no reasonable finder of fact could find in favor of plaintiff with respect to this claim.

In conclusion, plaintiff did not provide clear and convincing evidence of bad faith on behalf of defendant with regard to the treatment of any of the claims for the three accidents. As the parties filed cross-claims for summary judgment with respect to plaintiff's bad faith claims, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment for that claim will be granted.

## II.     Breach of Contract and Violation of the Pennsylvania MVFRL

Plaintiff's remaining claims pertain to breach of contract and violation of the Pennsylvania MVFRL. To establish a breach of contract claim with regard to an insurance policy, a plaintiff must show: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract [,] and (3) resultant damages." Reginald D. Ware Communications Inc. v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003), (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Plaintiff argues that defendant breached the terms of the insurance policy when it refused to pay any wage loss payments after August 30, 2005.  Plaintiff further argues that defendant failed to pay for some of plaintiff's holistic medicines.

The parties agree that on July 31, 2001, plaintiff purchased the Policy from defendant. The Policy provides first party benefits and uninsured and underinsured motorists coverages. The first party benefits include medical expenses and income loss.  Under the Policy, medical expenses are defined as:

> "***Medical Expenses***"  means reasonable and necessary charges for:
> (a) medical treatment, including but not limited to:
> > (1) medical, hospital, surgical, nursing and dental services;
> > (2) medications, medical supplies and prosthetic devices; and
> > (3) ambulance;
>
> (b) medical and rehabilitative services, including but not limited to:
> > (1) medical care;

(2) licensed physical therapy, vocational rehabilitation and occupational therapy;
(3) osteopathic, chiropractic, psychiatric and psychological services; and
(4) optometric services, speech pathology and audiology,

(c) nonmedical remedial care and treatment rendered in accordance with a recognized religious method of healing.

All medical treatment and medical and rehabilitative services must be provided by or prescribed by a person or facility approved by the Department of Health, the equivalent governmental agency responsible for health programs or the accrediting designee of a department or agency of the state in which those services are provided.

Payment of ***medical expenses*** incurred after 18 months from the date of the accident causing ***bodily injury*** shall be made only if within 18 months from the date of the accident it is ascertainable with reasonable medical probability that further expenses may be incurred as a result of the injury.

(Def.'s App. Ex. C 14.)  Under the Policy, "Income Loss" is defined as:

"***Income loss***" means eighty (80%) percent of gross income actually lost by an ***eligible person*** ...***Income loss*** does not include:...
(c) any loss of income during the first (5) five working days the ***eligible person*** did not work after the accident because of ***bodily injury***.

(Id.)

Plaintiff claims that he is owed interest on several outstanding payments from the January 3, 2002 and March 11, 2003 accidents pursuant to the Pennsylvania MVFRL. Section 1716 of the MVFRL provides for interest on claims' payments as follows:

> Benefits are overdue if not paid within 30 days after the insurer receives reasonable proof of the amount of the benefits. If reasonable proof is not supplied as to all benefits, the portion supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. Overdue benefits shall bear interest at the rate of 12% per annum from the date the benefits become due. In the event the insurer is found to have acted in an unreasonable manner in refusing to pay the benefits when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee based upon actual time expended.

75 PA. CONS. STAT. §1716.

### a. November 14, 2001 PIP Claim for Medical Expenses, PIP Claim for Income Loss and UM Claim

To the extent that plaintiff continues to assert breach of contract claims for medical expenses, income loss, and his UM claim for the November 14, 2001 accident, plaintiff admitted that all these claims were paid or settled. Plaintiff admitted that defendant paid all submitted bills for the November 14, 2001 PIP claim for medical expenses. (Def.'s App. Ex. D ¶¶ 7-9.) Plaintiff further admitted that defendant paid all the income loss for the November 14, 2001 accident on February 14, 2002. (Def.'s App. Ex. D ¶ 6.) Plaintiff admitted that on June 12, 2007, GEICO settled the November 14, 2001 UM claim for $11,000. Under these circumstances, there is no genuine issue of material fact concerning those claims and summary judgment will be granted in favor of defendant for plaintiff's breach of contract claims for PIP medical expenses and income loss and the UM claim for the 2001 accident.

**b.** **January 3, 2002 PIP Claim for Medical Expenses and UIM Claim and March 11, 2003 PIP Claim for Medical Expenses and UM Claim**

Plaintiff admitted that for the January 3, 2002 PIP claim for medical expenses, GEICO paid all submitted bills and interest on some of the bills.  Following several IMEs and PROs, GEICO terminated payment for medical expenses as of August 30, 2005.  (Def.'s App. Ex. D ¶¶ 36, 56, 59-62.)  No bills relating to medical expenses were submitted by plaintiff for the January 3, 2002 accident after August 30, 2005.  (Def.'s App. Ex. D ¶ 37.)  Plaintiff argues that some of his holistic medicine bills were not paid by GEICO as submitted for the March 11, 2003 accident.  Plaintiff, however, admitted that GEICO paid all medical bills for which Ingraham submitted proof of claim.  Plaintiff did not provide evidence that he ever provided proof of claim or submitted any bills after August 30, 2005.  Under those circumstances, plaintiff cannot support claims for breach of contract for unpaid medical bills for either the January 3, 2002 or March 11, 2003 accidents.

Plaintiff asserts a UIM claim for the January 3, 2002 accident.  The Policy limits of the tortfeasor in the 2002 accident were one million dollars, which must be exhausted before plaintiff can make a UIM claim against GEICO.  By letter dated March 18, 2008, the two parties confirmed that plaintiff had no basis upon which to expect that his claim will exceed the tortfeasor liability policy limits and the UIM claim with GEICO could be closed. (Def.'s App. Ex. AA.)  For the March 11, 2003 UM claim, the parties agreed that the claim was settled for $100,000 at mediation. Under those circumstances, plaintiff cannot sustain breach of contract

claims or Pennsylvania MVFRL claims for the January 3, 2002 UIM claim or the March 11, 2003 UM claim.

### c. January 3, 2002 PIP Claim for Income Loss and March 11, 2003 PIP Claim for Income Loss

As discussed above, plaintiff released all wage loss claims and allegations pertaining to wage loss for the period prior to August 31, 2005. Plaintiff makes several claims relating to this period including that defendant withheld payment of wage loss from the reporting date for the January 2002 accident until June 15, 2004, that the adjuster failed to pay any interest on those wages pursuant to the Pennsylvania MVFRL, and that defendant miscalculated plaintiff's wage loss for his part-time job. All these breach of contract and Pennsylvania MVFRL arguments are moot due to the Release signed by plaintiff and will not be addressed by the court.

For the period following August 30, 2005, defendant asserts that plaintiff failed to provide proof of claim for any injury resulting in a cessation of benefits and failed to cooperate in GEICO's investigation. Plaintiff asserts that he did provide proof of claim and that GEICO improperly stopped providing his wage loss benefits. GEICO's obligation to pay the first party benefits under the contract is dependent upon the compliance with certain terms and conditions, including cooperation in the claims investigation. With regard to first party benefits, the Policy provided as follows:

> ***Medical Reports: Proof of Claim.*** As soon as practicable the ***eligible person***, or someone on his behalf, shall give us written proof of claim, under oath if required, fully describing the nature

and extent of ***bodily injury***, treatment and rehabilitation received and contemplated and other information to assist us in determining the amount due and payable.

Proof of claim shall be made upon forms furnished by us unless we fail to supply such forms within 15 days after receiving notice of claim.

The ***eligible person*** shall submit to mental and physical examinations by physicians selected by us when and as often as we may reasonably require. We will pay the cost of such examinations.

The ***eligible person*** (or, in the event of such person's incapacity or death, his legal representative) shall, if we requires, sign papers to enable us to obtain medical reports and copies of records. A copy of such medical report will be forwarded to such ***eligible person*** upon his written request.

If benefits for ***income loss*** are claimed, the ***eligible person*** presenting such claim shall authorize us to obtain details of all earnings paid to him by an employer or earned by him since the time of injury or during the year immediately preceding the date of the accident.

(Def.'s App. Ex. C 52.) The Policy provided that, "No action shall lie against us on the part of any ***eligible person*** unless such person has fully complied with all the terms of the coverage." (Id.)

Plaintiff asserts that he was unable to work in his part-time job after August 30, 2005, because of psychological ailments. Plaintiff claims that Dr. Kneff, plaintiff's treating psychologist, provided a letter to plaintiff's counsel on August 31, 2006, detailing that plaintiff could not return to his part-time job as a direct result of the January 3, 2002 loss. (Pl.'s App. Ex.

9.)  Plaintiff also claims that he provided defendant with that letter and treatment notes that suggested plaintiff had problems with concentration, focus, and organization.  Plaintiff, however, admitted that he did not provide defendant with any disability slips from physicians restricting plaintiff from working for the period after August 30, 2005, as a result of psychological or psychiatric conditions which plaintiff alleged are related to the November 14, 2001, January 3, 2002, or March 11, 2003 motor vehicle accidents. (Def.'s App. Ex. D ¶ 67.)  Even if plaintiff's medical records show that he suffered from psychological ailments, he has not shown that he was restricted from working at his part-time job because of them and no reasonable jury could render a verdict in favor of plaintiff with respect to this claim.

Plaintiff claims that he provided further proof of claim. Prior to August 30, 2005, GEICO requested that plaintiff undergo an IME with Dr. Larson. Dr. Larson informed GEICO that plaintiff had not yet reached MMI and could possibly need a psychiatric evaluation. Dr. Larson stated that plaintiff was able to work at his full-time job with a twenty-five pound lifting restriction and did not render any opinion with respect to plaintiff's ability with regard to his part-time job. On November 12, 2002, plaintiff's family physician, Dr. Kush,  noted that plaintiff was being seen for post-traumatic stress disorder. Although Dr. Kush was not a psychiatrist, Dr. Kush wrote a letter to plaintiff's claims adjuster on March 14, 2005, with an assessment of post-traumatic stress syndrome secondary to which plaintiff claims was attached a disability slip that extended plaintiff's disability for his part-time job until September 30, 2005.  Plaintiff, however,

admitted that no disability slips pertaining to psychological ailments for the period after August 30, 2005 were provided to GEICO. As a result, plaintiff did not provide the proof of claim requested by GEICO and he cannot support breach of contract or Pennsylvania MVFRL claims for wage loss. Under those circumstances, a reasonable jury could not render a verdict in favor of plaintiff and summary judgment must be granted in favor of defendant.

## Conclusion

Based upon the evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not render a verdict in favor of plaintiff with respect to his claims for bad faith. With respect to plaintiff's claims for breach of contract and for violation of the Pennsylvania MVFRL, plaintiff failed to provide sufficient evidence to support his claims and a reasonable jury could not render a judgment in his favor. Summary judgment must be granted in favor of defendant with respect to all plaintiff's claims.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 24, 2009